## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CENTIMARK CORPORATION,                )
                                      )
    Plaintiff and Counter-Defendant,  )
                                      )   No. 08 C 7323
               v.                  )
                                      )
VINCENT J. VITEK and TECTA            )   Honorable Charles R. Norgle
AMERICA CORP.,                        )
                                      )
    Defendants and Counter-Plaintiffs. )

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court are the parties' cross-motions for summary judgment. The case arose from a familiar scenario, in which a high-level employee, Vincent J. Vitek ("Vitek"), signed a non-compete agreement with his employer, Centimark Corporation ("Centimark"), and years later resigned from his position and joined the company's direct competitor, Tecta America Corp. ("Tecta"). After Vitek's departure, Centimark invoked the parties' non-compete agreement and sued both Vitek and his new employer for breach of contract and myriad business torts. In response, Vitek and Tecta filed various counterclaims against Centimark. Eventually all parties moved for summary judgment. For the following reasons, Vitek and Tecta's motion for summary judgment is granted in part and denied in part. The Court reserves ruling on Centimark's motion for summary judgment.

### I. BACKGROUND

#### A. FACTS

Unless the Court notes otherwise the following facts are undisputed. Vitek began working for Centimark in September 1990. He started as a flooring sales trainee and worked in

Centimark's flooring division for ten years. In 2001 Centimark transferred Vitek to the company's roofing division, where he served as a National Accounts Manager ("NAM") for Centimark's Midwestern territory. In that role Vitek testified that he identified business opportunities for the company and informed regional salespeople of those opportunities. The salespeople, in turn, would prepare an appropriate bid for the job. He was not responsible, he says, for setting prices or managing other employees. In 2006 the company promoted Vitek to the position of Global Accounts Manager ("GAM"), a position that the company created to give its NAMs more upward mobility. For this position Vitek concentrated his efforts on a few priority customers in his assigned region. At one point Centimark introduced testimony from one of Vitek's supervisors, who stated that Vitek, while working as a GAM, influenced customer pricing. App., Ex. D, Hr'g Tr. at 101-102.

On September 12, 1990, around the time that Vitek began working for Centimark, the company's general counsel sent to Vitek a proposed Employment Agreement and asked Vitek to review it, discuss it with his attorney and sign it if he found it sufficient. The last line of the letter states, with emphasis: "Please note that this Agreement must be signed prior to the commencement of your employment with Centimark Corporation." Appx. to Def.'s 56.1 Statement, Ex. 8. This last line is relevant because the parties disagree as to when Vitek entered the Employment Agreement and, in turn, when he became subject to the Agreement's restrictive covenants.

Centimark says that Vitek signed and agreed to the terms of the Employment Agreement before he started working for the company and that Vitek knew prior to his start date that his employment was conditioned upon the execution of a non-compete agreement and its restrictive covenants. Vitek, on the other hand, maintains that he was unaware of any non-compete

2

agreement when he was hired and that any restrictive covenants to which he agreed were separate and distinct from his employment with the company. According to Vitek, he worked for one or two weeks before signing any non-compete agreements, and thus those agreements were mere afterthoughts to his employment. Vitek also maintains that his managers at Centimark threatened to withhold his first paycheck until he signed the restrictive covenants. Centimark denies this assertion, and there is nothing in the record to support this statement except for Vitek's testimony. Either way, without deciding exactly what happened when the parties executed the Employment Agreement, there is no dispute that Vitek signed the Employment Agreement and that it was dated September 12, 1990. There is also no dispute that the company added Vitek to the payroll on September 17, 1990, after he signed the Employment Agreement, which corresponded with the company's standard practice. App. Ex. C, Aff. of Turnell, ¶ 7.

As to the restrictive covenants, they specifically prohibited Vitek from engaging in a number of activities during his employment and for two years after his employment with Centimark. For instance, the agreement prohibited Vitek from:

- Soliciting Centimark's actual or potential customers for two years after termination of his employment;

- Working for a competing business that sells products or services that are the same as, or similar to, the products and services sold by Centimark, for two years following termination of his employment with Centimark; and

- Working for a competing business that solicits Centimark's clients or customers that have done business with Centimark during Vitek's employment.

See Def.'s Statement, App., Ex. 16 § 4.05. In addition to the above restrictions, the parties also point out that the Employment Agreement contained:

- A tolling provision that extended the restrictive covenants (non-compete and non-solicitation) by the length of time Vitek was in breach of those covenants;

3

- A liquidation damages clause that required Vitek to pay Centimark $50 for each day he was in violation of the restrictive covenants;

- A confidentiality clause that prohibited Vitek from disclosing the company's trade secrets and confidential information, such as, to name a few, methods, processes, inventions, projects, ideas and business information that included sales methods, sales volumes, customers, key purchasing personnel, personal data for buyers, marketing plans and other information;

- A clause that required Vitek to give Centimark 90 days notice of any claims he had against the company as a condition to bringing any lawsuit against it;

- A clause that shortened the statue of limitations on Vitek's claims against Centimark to one year; and

- A clause through which Vitek waived his ability to raise a breach of contract claim in defense to Centimark's breach of contract claim.

Id., Ex. 16 §§ 4.01, 6.03, 7.01.

On February 27, 2008, after working as a GAM in Centimark's roofing division for approximately two years, Vitek sent an e-mail to Mark Santacrose, Tecta's President and Chief Executive Officer ("Santacrose"), regarding possible employment with the company. In the e-mail, Vitek noted, "I would like to meet and discuss possible opportunities within your National Accounts Program as well as the possible ramifications of my current employment agreement," recognizing that his current agreement with Centimark could pose a problem. Def.'s Statement, Ex. 11. In response, Santacrose invited Vitek to interview with the company on March 4, 2008. Though unclear, the parties agree that at some point in early March 2008 Vitek met with Santacrose at Tecta's headquarters in Skokie, Illinois. After the meeting, the parties exchanged pleasantries over e-mail, and Santacrose requested a copy Vitek's employment agreement and a follow-up meeting for March 14, 2008.

Before receiving an offer of employment, on March 23, 2008 Vitek sent to Santacrose an e-mail that contained his compensation and bonus plan at Centimark. Pl.'s Statement, Ex. L. In

response, Santacrose asked, "[W]hat is your average gross profit on your sales?" Id. Vitek

responded, "John....I am sure you are aware that this is proprietary information." Id. With that

qualifier, Vitek explained that in his position he doesn't directly influence gross profit, but that

"most sales range low 30% to upwards of 50% dependent on project and logistical difficulty,

relationship, etc." Id. He went on, noting that Centimark is not a "low bid" organization, but

that the company's sales are driven by its salesmen and their ongoing relationships. Id.

> Santicrose said in response:
>
> Yes, I'm Very aware that we (tecta) ha[ve] shared confidential info and that you
> are sharing confidential info. I wouldn't ask if it wasn't essential and necessary in
> order to review an[d] consider an appropriate performance based compensation
> package. Your [gross profit] info is very broad. Could you be much more
> specific relating to the overall average for your personal [gross profit] for the
> year? Thank you for assisting me with this info[.]

Id. During discovery, Centimark's Executive Vice President, John Godwin, testified that the

company has never shared this type of information with its customers or its competitors, and that

this information is available only to management employees responsible for projects.

Vitek's employment negotiations with Tecta continued throughout March and April and,

on April 14, 2008, Tecta's Vice President of Human Resources extended an offer of

employment. He did so in a letter, which set forth the terms of the offer and, as to Vitek's

employment agreement with Centimark, stated:

> You have provided us with a copy of your 1990 employment agreement with
> Centimark. Regardless of whether the provisions of that agreement are valid and
> enforceable, Tecta expects you to maintain the confidentiality Centimark's trade
> secrets, proprietary, and confidential information (including but not limited to
> prospective and or current customer lists and/or information).

Id., Ex. 12. The letter went on, stating that Vitek was not allowed to disclose confidential

information, nor was he allowed to solicit Centimark's customers with which Vitek worked

during his last two years of employment with Centimark. Id.

Vitek accepted Tecta's offer of employment and agreed to start working on May 12, 2008. In line with his start date, Vitek announced his resignation from Centimark on April 21, 2008. Centimark asked Vitek to leave the company immediately.

## B. PROCEDURAL HISTORY

On May 1, 2008 Centimark sued Vitek, Tecta and another former Centimark employee (who has since been released from the matter) in the U.S. District Court for the Western District of Pennsylvania. The company raised several claims, including breach of the Employment Agreement, misappropriation of trade secrets, tortious interference, unfair competition, breach of fiduciary duties, inducement of breach of fiduciary duties, civil conspiracy, unjust enrichment and breach of the Confidentiality and No-Hire Agreement. The next day, on May 2, 2008, Centimark sought a temporary restraining order against the defendants. The Pennsylvania District Court denied it. A few weeks later the parties entered a consent order that would govern the parties' relationship prior to Centimark moving for a preliminary injunction. The order, for the most part, enjoined Vitek from a variety of activities, many of which mimicked those in the Employment Agreement's restrictive covenants.

On December 18, 2008 the Western District of Pennsylvania issued an order that affirmed a ruling by the Magistrate Judge to transfer the case to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a). The parties then proceeded in this Court. Approximately one year after the transfer, Centimark sought a preliminary injunction against Tecta. Centimark based the injunction on Vitek's alleged involvement in the bidding process for a job with one of Centimark's longstanding customers, Owens-Illinois ("O-I"), though the circumstances surrounding the bidding process is a subject of contention.

In May 2009, O-I began soliciting bids for its roofing projects. Both Centimark and Tecta bid on O-I's projects. Centimark maintains that bidding was limited to "preferred providers," and Tecta had not yet become such a provider and thus was ineligible to bid on the project. Centimark also claims that Vitek had access to information about O-I and knew that O-I was one of Centimark's important customers. Tecta admits that Vitek assisted the company in submitting a bid to O-I, but it denies that Vitek shared confidential information that he learned during his time at Centimark. In the end, O-I awarded the job to Centimark, though the company claims that it had to lower the prices and rates that it previously offered to O-I because Vitek was involved in the bidding process. Tecta disagrees. It contends that Centimark had to lower its prices because of the competitive bidding process, not because of Vitek's involvement. Either way, the Court denied Centimark's motion for a preliminary injunction, finding that although Centimark demonstrated a likelihood of success on the merits, the company failed to establish either an adequate remedy at law or that it would suffer irreparable harm.

As the case moved forward, Centimark apparently discovered that Vitek solicited several Centimark customers after he left the company and, as a result, compromised Centimark's relationships with those customers. Citing specific emails that were produced during discovery, Centimark listed the companies that Vitek solicited as: O-I, Cargill, Welsh Companies, Transwestern Commercial Services, Regency Centers, John Deere and Co., Inland Properties and Jones Lang LaSalle. Pl.'s 56.1 Statement ¶ 68. Tecta denies this, however, noting that aside from the O-I contract, Centimark "did not identify any contracts, customers, or relationships with which Defendants have interfered." Def.'s 56.1 Statement ¶ 68.

In answering Centimark's complaint, Vitek asserted three counterclaims for breach of contract, promissory estoppel and a violation of the Illinois Wage Payment and Collections Act.

7

His counterclaims were based on Centimark's alleged failure to pay Vitek a discretionary bonus for 2007 and on Centimark's alleged failure to pay Vitek the full value of stock options that the company, according to Vitek, forced him to return. Tecta filed its own counterclaim for tortious interference with business expectancy.

On June 25, 2010 all parties moved for summary judgment. Vitek and Tecta moved for summary judgment on all claims brought by Centimark, and Centimark moved for summary judgment on all the counterclaims against it. In response Tecta voluntarily dismissed its counterclaim based on tortious interference, and Vitek voluntarily dismissed his counterclaims based on Centimark's alleged failure to pay him a discretionary bonus. Vitek continued to pursue his claims based on Centimark's alleged failure to pay him the full value of the stock options he once owned. The parties' cross-motions for summary judgment are fully briefed, but the Court shall limit its ruling at this point to Defendants' motion for summary judgment.

## II. DISCUSSION

### A. STANDARD OF DECISION

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether genuine issues of material fact exist, the reviewing court construes all facts and draws all reasonable inferences in favor of the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chi., 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See U.S v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 280 (1968);

Spiegla v. Hull, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

In contesting a motion for summary judgment, the nonmoving party cannot rest on the pleadings alone; it must instead identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show that a genuine issue of material fact exists. See Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch., 278 F.3d 693, 699 (7th Cir. 2002). The mere existence of some alleged factual dispute, or some perceived metaphysical doubt as to the material facts, will not defeat an otherwise properly supported motion for summary judgment, as speculation will not suffice. Amadio v. Ford Motor Co., 238 F.3d 919, 927 (7th Cir. 2001); see also Borcky v. Maytag Corp., 248 F.3d 691, 695 (7th Cir. 2001); Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000). It follows, then, that "conclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hosp. & Med. Ctr., 328 F.3d, 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888-89 (1990)). Finally, in deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002).

## B. BREACH OF CONTRACT (COUNT I)

At the root of this dispute is Vitek's Employment Agreement and the restrictive covenants contained in that Agreement. Defendants seek to invalidate the Agreement for three reasons. The Court shall discuss them in turn.

First, Defendants insist that because Centimark did not inform Vitek that he needed to sign the restrictive covenants prior to his start date, those restrictive covenants are invalid and

unenforceable. In Pennsylvania, whose laws govern this inquiry, restrictive covenants are only

enforceable if they are executed "incident to" one's employment. John G. Bryant Co. v. Sling

Testing & Repair, Inc., 369 A.2d 1164, 1168 (Pa. 1977); Kistler, Inc. v. O'Brien, 347 A.2d 311,

315-16 (Pa. 1975). A restrictive covenant is "incident to" one's employment if the parties

understand it to be part of the employment relationship at the time the terms and conditions of

the employment are reached. Kistler, Inc., 347 A.2d at 315-316. Under this construct, the

timing of events becomes important, as proximity could dictate whether the restrictive covenants

were ancillary to Vitek's employment.

Defendants argue that Centimark did not advise Vitek of the restrictive covenants until

after he negotiated the terms of his employment and after he began working for the company.

This fact, according to Defendants, renders the restrictive covenants unenforceable. But

Centimark counters this argument with evidence that Vitek signed the Employment Agreement

several days before he began working at Centimark. There is no dispute that the parties'

Agreement is dated September 12, 1990. Beyond that, Centimark submitted to the Court Vitek's

W-4 and I-9 forms, which Vitek signed on September 11, 1990. The company also disclosed a

letter to Vitek from Centimark's general counsel, in which counsel explained that Vitek was

required to sign the Agreement prior to his employment with the company. Centimark also

shows that it reviewed Vitek's forms and added him to the company payroll on September 17,

1990, the Monday after he signed his employment forms and Agreement. And, Centimark

verified through two affidavits that it is the company's standard practice to require all new

employees to sign an employment agreement before the employee can receive his or her first

paycheck. Finally, the evidence shows that Vitek received his first paycheck on September 28,

1990, along with an executed copy of his Employment Agreement. A reasonable inference to

draw from this evidence is that Centimark had already received a signed copy of the Agreement prior to executing it and sending it to Vitek along with his first paycheck. In sum, given what Centimark has submitted in support of its opposition to summary judgment, a reasonable jury could find that the restrictive covenants were incident to Vitek's employment. Defendants' first argument to invalidate the Agreement is unavailing.

Second, Defendants argue that Centimark's "overreaching" with respect to the restrictive covenants invalidates Vitek's employment agreement. Here the argument goes that the Agreement's restrictive covenants are so broad and restrictive that they reflect "an intent to oppress the employee [or] to foster a monopoly, either of which is an illegitimate purpose." Sidco Paper Co. v. Aaron, 351 A.2d 250, 257 (Pa. 1976). It is well-accepted, in Pennsylvania and elsewhere, that to be enforceable restrictive covenants must be reasonable in both geographic and temporal scope and must serve to protect the employer's legitimate business interest. Hess v. Gebhart & Co., 808 A.2d 912, 917 (Pa. 2002). When restrictive covenants go beyond the scope that courts deem reasonable, courts may find them unenforceable. But such a finding is not a simple task. As Defendants recognize, courts in Pennsylvania will not, absent bad faith, "blue-pencil" otherwise broad "covenants before refusing enforcement altogether." Victaulic Co. v. Tieman, 499 F.3d 227, 238 n.7 (3d Cir. 2007) (citing Sidco Paper Co., 351 A.2d at 254-57). The burden of proof rests with the defendant at all times to show that the covenant is unreasonable or that it should not be enforced. John G. Bryant Co. Inc. v. Sling Testing & Repair, Inc., 369 A.2d 1164, 1169 (Pa.1977). With these standards in mind, the Court turns to the restrictive covenants.

Upon review of the evidence, Defendants' position is rather overstated. First of all, Centimark presented evidence that calls into doubt the circumstances through which Vitek

signed his Employment Agreement; thus there is little to support the notion that Centimark somehow *withheld* Vitek's paycheck to force him to accept the restrictive covenants, as Defendants would have us believe. Also, there is no dispute that for several years Vitek served as a high-ranking member of Centimark's sales team. He handled high-value clients and provided nationwide services for those clients. Those services, in light of Vitek's position, were unique in character. Centimark has submitted evidence illustrating that the company's relationships with its customers, along with the company's sales strategies and other data regarding the roofing business, are valuable assets acquired as a result of its efforts over a substantial period of time, which includes Vitek's tenure. In this light it is reasonable that Centimark would expand the scope of its restrictive covenants to protect the valuable information of which the company's high-level managers, including Vitek, would have had knowledge. That said, there is nothing to suggest that the restrictive covenants in this case overreached in this endeavor, nor is there enough evidence to find that Centimark sought to stifle the competition and restrict trade in such a way that would support a finding of summary judgment in Defendants' favor.

The Court recognizes, moreover, that Pennsylvania courts have consistently affirmed covenants not to compete for terms of two and three years after employment ends. See Bryant, 369 A.2d at 1170 (three years). And as to the restrictive covenants' geographic scope, "courts have established a linear connection between reasonableness of a geographic restriction and the employer's verifiable market." Med. Wellness Assocs. v. Heithaus, No. 6500 of 2000, 2001 WL 1112991, at *25 (Pa. Com. Pl. Feb. 13, 2001) (citing cases). It is not uncommon, then, that Pennsylvania courts have upheld nationwide restrictions where those restrictions were reasonably designed to prevent disturbance of the company's relationships that it established

over the course of several years, e.g., Volunteer Firemen's Ins. Servs. Inc. v. CIGNA Prop. & Cas. Agency, 693 A.2d 1330 (Pa. Super. 1997), which is precisely what Centimark has done in this case.

Third, Defendants argue that if the Court decides to "blue-pencil" the restrictive covenants to make them reasonable, the resulting agreement would mirror the consent order that the parties entered in 2008, and thus Centimark is adequately protected. But this doesn't justify summary judgment. To be clear, the Court finds no reason to "blue-pencil" the Agreement. The evidence that Defendants submitted does not support a finding that Centimark overreached in its efforts to enforce the Agreement, much less provide the Court with a reason to meddle with the restrictive provisions that Vitek agreed upon. In this case, seeing that the Court has determined that Centimark's restrictive covenants are reasonable, an argument based on the Court's decision to "blue-pencil" the Agreement is inconsequential. Defendants' motion for summary judgment is denied on this point.

## C. BREACH OF CONFIDENTIALITY / NO-HIRE AGREEMENT

Defendants next focus on Centimark's claim that Tecta breached the parties' confidentiality/no-hire clause (Count IX). For clarity, the Court notes that this particular agreement is separate and distinct from Vitek's Employment Agreement, which the Court discussed above. The parties' confidentiality/no-hire clause appears in a letter agreement that the parties' chief executive officers exchanged on March 13, 2007 in light of a possible merger. See Pl.'s Resp. at 22. In it Centimark and Tecta agreed that "during a twelve month period following the date" of the letter agreement each party would "not . . . solicit for hire or hire any senior management employee of each others company." Appx. to Def.'s 56.1 Statement, Ex. 19 at 3. Given the negotiations between Vitek and Tecta, Centimark claims that the Defendants breached

the no-hire clause in the letter agreement. Defendants contend that the argument fails, however, because according to Defendants: (1) the no-hire agreement is overbroad and unenforceable; (2) Tecta did not "solicit" Vitek; and (3) Centimark has not been damaged by the alleged breach. Given the totality of the evidence, all three arguments are unavailing.

First, the Court finds that there is little evidence to support the contention that the parties' confidentiality/no-hire agreement is overly broad when applied to Vitek. To support this argument, Defendants rely on Pactiv Corp. v. Menasha Corp., 261 F. Supp. 2d 1009 (N.D. Ill. 2003), a case that is easily distinguishable. As Centimark points out, that case involved a confidentiality agreement with a three-year no-hire restriction for what the parties called, "restricted employees." Id. at 1011. The agreement defined "restricted employees" as any "management-level employee" of plaintiff or its subsidiaries. In effect the no-hire clause prohibited defendant from hiring approximately eight-hundred and fifty-four employees in more than one-hundred companies world-wide for three years. Id. at 1012. Not surprisingly, the court determined that the restriction was too broad.

This case is entirely different. Here the restrictive period is limited to one year, and involved only those employees that the parties considered "senior management." For Centimark and Tecta, "senior management" did not mean hundreds upon hundreds of national roofing salesmen stationed in over one-hundred offices world-wide. It meant the parties' key personnel, over a span of one year, which is more than reasonable to protect the parties' legitimate business interests. The confidentiality/no-hire agreement is not overbroad.

Defendants next argue that Tecta did not breach the no-hire agreement because it did not "solicit" Vitek; it was Vitek that approached Tecta. So much is clear. It's true that Vitek was the first to reach out to Tecta; but the negotiations did not stop there. With respect to Vitek's

initial inquiry, Tecta's CEO responded immediately and invited Vitek for an interview. And, when Vitek thanked Tecta's CEO for the opportunity, he again responded promptly, requested a copy of Vitek's Employment Agreement and scheduled a follow-up meeting on March 14, just a few days before the confidentiality/no-hire agreement expired. Based on these negotiations, the Court agrees with Centimark that an issue of fact exists as to whether Tecta's conduct constituted a solicitation.

A question also exists as to another Centimark employee, Patrick Hansen, who Tecta hired after the parties' agreement expired. In 2007, Tecta hired a recruiter to search for candidates to fill a national sales position at the company. At her deposition, the recruiter testified that Tecta's vice president of human resources suggested that she contact at least two Centimark employees because, according to the recruiter, Tecta was specifically interested in candidates that previously worked with Centimark. She also testified that eventually she arranged for Hansen to meet with Tecta, which continued the hiring process until February 2008. Tecta hired Hansen in April 2008. Faced with this testimony, a reasonable juror could conclude that Tecta solicited Centimark's employees in breach of the confidentiality/no-hire agreement's two-year restricted period. Summary judgment is denied as to Count IX.

## D. DAMAGES FOR CONTRACT CLAIMS

Tecta raises a meaningful argument with respect to damages. Damages are crucial to any contract claim, and should a plaintiff fail to sufficiently establish the damages it suffered as a result of the alleged breach of the parties' agreement, the plaintiff's claim for breach of contract fails. It is well-established that to recover under a breach of contract the non-breaching party's damages must flow from the breach "naturally and ordinarily" and "be proved with reasonable certainty." Liss & Marion, P.C. v. Recordex Acquisition Corp., 983 A.2d 652, 662 (Pa. 2009).

Knowing this, Tecta avers that Centimark never lost a sale, a customer or a project as a result of Defendants' conduct. Centimark disagrees. Centimark produced an affidavit by its vice president of national sales, John Godwin, who testified that the company was required to alter its sales approach and accept lower profit margins when it bid on projects for which Tecta also submitted a bid. According to Godwin, this is because Vitek shared Centimark's pricing strategies and pricing structures with Tecta prior to the time that Tecta submitted its bid. Godwin explained that he was "aware of Vitek's influence every time Centimark compete[d] against Tecta for a roofing project for a national account." Aff. of John Godwin, Pl.'s Rule 56.1 Statement, Ex. F ¶ 11. He described the information that Vitek shared as "some of Centimark's most highly confidential and proprietary information" which the company "never shared . . . with its customers or its competitors." Id., Ex. F ¶ 5. Godwin concluded that "[b]y understanding Centimark's capabilities, Tecta has developed a sales strategy that will focus on Centimark's shortcomings." Id., Ex. F ¶ 11.

While the Court agrees with Defendants that Godwin's affidavit lacks concrete details of the pricing strategies that Vitek shared with Tecta, the Court cannot conclude, without drawing its own inferences, that the affidavit is so speculative or so lacking in merit that it must be disregarded. The affidavit revealed that after Vitek departed Centimark and joined Tecta, Centimark was required to alter its bidding process and offer price discounts to secure business that Tecta was competing for, which resulted in decreased profit margins. The Court finds that Centimark has submitted just enough evidence with respect to its damages to survive summary judgment. A reasonable jury should have an opportunity to weigh Godwin's testimony and credibility, so that it may properly determine whether Defendants damaged Centimark by

requiring it to alter its pricing strategies and decreasing its profits. The Court cannot decide these issues at the summary judgment phase. The motion is denied.

## E. CENTIMARK'S TORT CLAIMS

### 1. *Misappropriation of Trade Secrets (Count II)*

For Count II, Centimark alleges that Defendants misappropriated the company's trade secrets and thus violated the Illinois Trade Secrets Act. To prevail on such a claim, Centimark must show: (1) the information at issue was a trade secret; (2) it was misappropriated; and (3) it was used in Defendants' business. Learning Curve Toys, Inc. v. Playwood Toys, Inc., 342 F.3d 714, 721 (7th Cir. 2003). In support of summary judgment Defendants focus on elements one and three above, arguing that Centimark failed to demonstrate the existence of a trade secret, and that even if it had Tecta didn't use the trade secret in its business.

As to the first element, the Court must consider a host of factors to determine whether a piece of company information constitutes a trade secret. For example, to qualify as a trade secret the Court must ask whether the information was sufficiently secret to give it a competitive advantage, 765 ILL. COMP. STAT. § 1065/2(d)(1), and whether plaintiff safeguarded that secret to keep others from acquiring it, Id. § 1065(d)(2). And, beyond the two requirements above, many times courts consider several common law factors, including the extent to which the secret is known outside the business, the extent to which employees inside the business know the information, the value of the information to plaintiff and its competitors, the amount of money plaintiff expended to protect it and the ease by which the information could be acquired. Liebert Corp. v. Mazur, 827 N.E.2d 909, 921 (Ill. App. Ct. 2005); ILG Indus., Inc. v. Scott, 273 N.E.2d 393, 396 (1971) (citing RESTATEMENT (FIRST) OF TORTS § 757, cmt b (1939)). According to the RESTATEMENTS, a "trade secret" may not necessarily be a process or device, but may simply

relate to the business's operations, "such as a code for determining discounts," or "other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management." Id. § 757, cmt. b.

In this case, the underlying trade secrets that Vitek allegedly misappropriated and shared with Tecta are customer lists, customer contact information, pricing and profit information and pricing strategies. Centimark notes that this information was assembled over a period of several years, and thus to safeguard this information the company required its managers to sign non-disclosure agreements and kept the information on password-protected servers that only senior salesmen could access. Moreover, Centimark's vice president of national sales, John Godwin, testified that this information was never shared with individuals on the outside and, after Vitek left the company, he could tell when Vitek was influencing a competing bid on a national roofing project. As a result, Centimark avers that it was required to accept narrowed profit margins when bidding on projects.

Keeping in the mind the factors above, the Court finds that summary judgment on this issue is unfounded. The information that Vitek allegedly misappropriated was neither obvious nor disclosed. Centimark has presented enough evidence to show that it protected the information and that it was unavailable both within and outside the organization to anyone other than high-level sales employees. Recall that Godwin described this information as "highly confidential," and that by using this information Tecta was able to alter its sales strategy to improve its bids when competing with Centimark. This testimony is enough to create an issue of fact as to whether Defendants misappropriated Centimark's trade secrets. The Court denies summary judgment on Count II.

## 2. *Tortious Interference with Contract or Prospective Business (Count III)*

Defendants also argue that they have not tortiously interfered with Centimark's relationships, its contracts or its prospective economic advantage, and thus Centimark's claims for tortious interference fail. To establish a claim of tortious interference, a plaintiff must establish the following elements: (1) the existence of a valid contract or prospective relationship between the plaintiff and a third party; (2) the defendant's awareness of that contract or relationship; (3) the defendant's specific intent to harm the valid contract or to prevent the prospective relationship; (4) the absence of a privilege or other justification for the defendant's conduct; and (5) the third party's breach and damage to plaintiff. Kia v. Imaging Sciences Int'l, Inc., -- F. Supp. 2d --, 2010 WL 3322696, at *7 (E.D. Pa. Aug. 20, 2010) (citing Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175, 1183 (1978)). In Pennsylvania, a "prospective contractual relationship" has been described as "something less than a contractual right, something more than a mere hope" and exists only when there is a "reasonable probability that a contract will arise from the parties' current dealings." Alvord Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1015 (3d Cir. 1994). In light of these standards, it is clear that Centimark's claim for tortious interference fails for a number of reasons.

The only evidence before the Court to support a claim of tortious interference is Defendants' alleged interference with Centimark's long-standing customer, O-I. Recall that after Vitek left Centimark to work at Tecta, the two companies bid on a project for O-I. Centimark eventually won that contract, though it claims that it was forced to alter its pricing arrangements in order to do so. But this scenario does not support a claim for tortious interference. Beyond the fact that a contract did not yet exist between Centimark and O-I, perhaps the most prominent miscalculation on Centimark's behalf is the absence of any evidence with respect to Defendants'

specific intent to harm Centimark's prospective relationship. Defendants, as they point out, were merely competing for O-I's business. O-I invited both Centimark and Tecta to bid on the project; it was not the case that Centimark had the exclusive right to bid on the project because of its prior dealings with O-I. Centimark and O-I had a long-standing relationship. Nevertheless, there is nothing in the record to support the argument that Tecta was shut out of the bidding process because of Centimark's relationship with O-I. That simply wasn't the case. Tecta, if anything, competed for O-I's business and was therefore protected under the "competitor's privilege."

The competitor's privilege stems from the Second Restatement of Torts, which advises that a competitor who allegedly interferes with a plaintiff's contractual relations is excused from doing so if the competitor: is competing with the plaintiff and does not employ wrongful means; does not restrain trade; and is one whose "purpose is at least in part to advance his interest in competing with" the plaintiff. See RESTATEMENT (SECOND) OF TORTS § 768; Opticsplanet, Inc. v. Opticsale, Inc., No. 09 C 7934, 2010 WL 2773934, at *1 (N.D. Ill. July 14, 2010) (describing the privilege and citing cases). The privilege, which Defendants satisfy, essentially allows a party to divert business from a competitor provided that the competing party is not motivated by spite or ill will. Id. (quoting Miller v. Lockport Realty Group, Inc., 878 N.E.2d 171, 178 (Ill. App. Ct. 2007)). There is no dispute that the parties were competing for the O-I contract. More importantly, there is no evidence, circumstantial or otherwise, that Tecta employed "wrongful means" when preparing its bid. There is also no evidence of a restraint on trade, and Tecta's main objective in preparing its bid was to advance its own interest in competing against Centimark in the roofing business. Summary judgment is granted as to Count III.

### 3. Unfair Competition (Count IV)

Centimark next alleges a claim for unfair competition. In Illinois, to establish unfair competition, which the Illinois Deceptive Trade Practices Act codified, a plaintiff must establish many of the elements that underlie an action for trademark infringement. See Ty Inc. v. Softbelly's Inc., No. 00 C 5230, 2006 WL 5111124, at *15 (N.D. Ill. Apr. 7, 2006) (applying likelihood of confusion test for claims of unfair competition and trademark infringement). This case, however, has nothing to do with trademarks, nor does it deal with the alleged confusion of trademarks or the unlawful use of another's trademark. As it currently stands, there is no evidence in the record to support a claim of unfair competition. Summary judgment is therefore granted on Count IV.

### 4. Breach of Fiduciary Duty (Count V) and Inducement (Count VI)

Centimark next alleges claims for breach of fiduciary duty against Vitek (Count V) and inducement of that breach against Tecta (Count VI). To establish a claim for breach of fiduciary duty, a plaintiff must establish the existence of a duty and a breach of that duty that proximately caused an injury to plaintiff. Neade v. Portes, 739 N.E.2d 496, 503 (Ill. 2000). A fiduciary relationship exists between a principal and an agent as a matter of law. Crichton v. Golden Rule Ins. Co., 832 N.E.2d 843, 854 (Ill. App. Ct. 2005). And, although an employee's duty to his employer typically ends upon the termination of his employment, as Defendants point out, e.g., Dames & Moore v. Baxter & Woodman, Inc., 21 F. Supp. 2d 817, 823 (N.D. Ill. 1998), "a restrictive covenant may create an ongoing fiduciary duty even after an employee leaves a company." Integrated Genomics, Inc. v. Kyrpides, No. 06 C 6706, 2008 WL 630605, at *10 (N.D. Ill. Mar. 4, 2008). This is precisely what happened in this case.

Here, it is undisputed that Vitek assumed a fiduciary duty to Centimark, which extended beyond the term of his employment because of the restrictive terms in his Employment Agreement. Again, those terms were valid. Tecta argues, though, that Centimark failed to identify the damage the company suffered as a result of Vitek's alleged breach, and thus the claim necessarily fails. But this is not an open and shut issue. As the Court mentioned previously, a question remains as to Centimark's damages. An affidavit submitted by a top company sales official indicates that Centimark had to alter its pricing structure as a result of Vitek's conduct. And, it is undisputed that Tecta reached out for this information during its discussions with Vitek regarding his potential employment. As to this, Centimark's sales executive explained that what Vitek shared was "highly confidential" and never shared with competitors no matter the context. This testimony is just enough to create an issue of fact as to liability for a claim of breach of fiduciary duty and the inducement of that breach. Summary judgment is denied on Counts V and VI.

### 5. Civil Conspiracy (Count VII)

Centimark next claims that Defendants conspired to cause the company injury, and thus Defendants should be held accountable under the doctrine of civil conspiracy. On this issue, while Centimark failed to provide the Court with any meaningful argument or cases in its response brief, the Court finds that it nevertheless has failed to present sufficient evidence to survive summary judgment. Conspiracy requires an agreement between two or more persons to perform acts in furtherance of the agreement so that they accomplish an unlawful purpose that injures another. Bressner v. Ambroziak, 379 F.3d 478, 483 (7th Cir. 2004). What's missing here is an agreement to accomplish an unlawful purpose through unlawful means. By making a few long and uncertain logical leaps, one could conclude, perhaps half-heartedly, that when Tecta

asked Vitek to provide it with a copy of his Employment Agreement and his gross profit on sales, and when Vitek agreed to do so, the two Defendants conspired to injure Centimark. The evidence, however, is not so clear cut. The evidence indicates that by asking for Vitek's Employment Agreement and gross profit on sales, Tecta sought to put together a compensation package that would rival its competitor and therefore entice Vitek to join its ranks of national salesmen. There is no evidence that the Defendants sought to use this information for an unlawful purpose. And, as the Court stated above, a reasonable juror may construe this conduct as a breach of the parties' restrictive covenants, but that does not in turn satisfy the requirements for a civil conspiracy. In the end, this case involves a contract dispute. Centimark's civil conspiracy claim has no evidentiary basis, and thus summary judgment must be granted in Defendants' favor. Summary judgment is granted as to Count VII.

## F. UNJUST ENRICHMENT

Centimark also argues that Defendants have been unjustly enriched by their conduct, although the Court agrees with Defendants that the claim is meritless. In Illinois, the existence of a contract ordinarily bars unjust enrichment claims. See Keck Garrett & Assoc. v. Nextel Commc'ns, Inc., 517 F.3d 476, 487 (7th Cir. 2008); Sharrow Group v. Zausa Dev. Corp., No. 04 C 6379, 2004 WL 2806193, at *3 (N.D. Ill. Dec. 6, 2004) (noting that unjust enrichment is unavailable where parties have entered an express contract). The only exception to this rule is an unenforceable contract, U.S. Nursing Corp. v. St. Joseph Med. Ctr., 39 F.3d 790, 792 (7th Cir. 1994), which the Court has not encountered here. Again, this case involves an Employment Agreement, and a question exists as to whether Defendants breached that agreement while negotiating an employee's defection to a competing company. The crux of any claim for unjust enrichment claim, as the cases above illustrate, is that a contract between the parties did not

exist. It is an equitable theory for which damages or some other benefit must be retained by Defendants. Either way, it is clear that a contract exists in this case. Accordingly, the motion for summary judgment is granted as to Count VIII.

## G. INJUNCTIVE RELIEF

Finally, Centimark states that at the close of the evidence, see Pl.'s Resp. at 17, it is entitled to and will seek a permanent injunction that requires Vitek to comply with the "the nondisclosure provisions of his Agreement forever and the non-solicitation portion of his agreement until November 2011." Id. at 16. In anticipation of Centimark's motion, which the company is yet to present, Tecta argues that Centimark is not entitled to seek injunctive relief because it has "unclean hands," because it cannot establish a likelihood of success on the merits of its claims and because it cannot establish the absence of an adequate remedy or irreparable harm. Def.'s Memo. at 24. But the Court need not address these issues at this point in the proceedings. In short, Defendants' arguments are premature, as they seek summary judgment on a prospective motion that Centimark has not brought. And although Centimark stated that it will bring the motion "at the close of the evidence," it has not presented the motion before this Court. It is not a claim listed in the complaint, and it is not part of the prayer of relief that it presented in response to Tecta's motion for summary judgment. If at the close of the evidence Centimark moves for a permanent injunction, the Court will entertain any and all objections at that point in time. For now, summary judgment is denied.

## III. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is denied as to Counts I, II, V, VI and IX. Defendants' motion for summary judgment is granted as to Counts III, IV, VII and VIII.

IT IS SO ORDERED.

ENTER:

CHARLES R. NORGLE, Judge
United States District Court

DATED: _12-29-10_